**Richard BONADONNA and Barbara Bonadonna, Plaintiffs,**

**v.**

**Saul COOPERMAN, the Board of Education of the Borough of Franklin Lakes, and John Manz, Defendants.**

**Civ. A. No. 84–1104.**

United States District Court,
D. New Jersey.

Aug. 20, 1985.

Arthur J. Nevins, Jr., New York City, for plaintiffs.

Andrew Mainardi, Jr., Mainardi & Mainardi, Paterson, N.J., for defendants.

**OPINION**

SAROKIN, District Judge.

This matter is before the court on the parties' cross-appeals of decisions of the New Jersey Office of Administrative Law. Plaintiffs Richard and Barbara Bonadonna, suing on behalf of their hearing impaired eight-year-old daughter Alisa, challenge a February 22, 1984 decision of Administrative Law Judge Naomi Dower-LaBastille concluding that the appropriate educational placement for Alisa is in the Bergen County Hearing Impaired Program in Ridgewood, New Jersey, rather than in the regular first-grade class in plaintiffs' neighborhood school in Franklin Lakes, New Jersey. Defendant Board of Education of Franklin Lakes School District counterclaims, challenging the February 1, 1985 decision of the Administrative Law Judge George Perselay ordering the Board to "prepare a program and effect a resource room placement, utilizing the services of [Sharyn] Buonpane," a certified teacher of the deaf and hard of hearing and an employee of the Board since 1970. At issue are the rights of the parties under the Education of All Handicapped Children Act, 20 U.S.C. § 1401 *et seq.* ("EAHCA"); more fundamentally, however, the court is here called upon to determine the appropriate future education of a little girl.

BACKGROUND

The basic facts underlying this action are stipulated to in the Final Pretrial Stipulation of the parties. Born May 22, 1977, Alisa Bonadonna has a bilateral sensorineural hearing loss, profound in the left ear and severe in the right. She wears a hearing aid to improve residual hearing in the right ear and can detect the presence of speech and environmental noises. Her parents, Richard and Barbara Bonadonna, became concerned when Alisa lagged in speech development; unfortunately, the experts whom they consulted failed to diagnose Alisa's hearing loss until she was three years old. Shortly thereafter she was placed in the Bergen County Hearing

Impaired preschool program (HIP). Alisa began to develop speech and language in that setting with the out-of-school support and assistance of her parents, especially her mother, and her grandmother who is also part of the family unit. Alisa spent about thirteen months in the Hearing Impaired Program in New Milford, New Jersey, during which period the family moved to Franklin Lakes.

During her preschool training, Alisa learned to produce sixty-eight percent of the twenty-five consonant digraph sounds. However, in spontaneous speech, her sound production was less efficient. Alisa demonstrated excellent reasoning ability in non-language tasks, but her ability to utilize language meaningfully was rudimentary. By June, 1982, she was responsive to visual cues, as she is now, and she excelled at visual tasks, as well as those which could be solved by manipulation of concrete objects including building, puzzle solving, map reading, sequencing objects, discriminating among shapes and letters and counting numbers up to ten. Her intellectual potential appeared to be in the superior range; indeed, testing placed her I.Q. between 110 and 120.

Upon considering Alisa's kindergarten placement, the Franklin Lakes Child Study Team first recommended that Alisa continue in the Hearing Impaired Program, but when the parents objected to such placement the Child Study Team ("CST") sought and obtained the permission of the HIP administration to release Alisa an hour early every day, so that she could return to Franklin Lakes, and spend the rest of the day in her regular classroom. Alisa's parents appealed this CST placement recommendation to the superintendent of schools, who granted their request to keep Alisa in the regular kindergarten. Additionally, the Board agreed to provide one-to-one speech therapy with Rose Wolcott, a speech/language pathologist, and to transport Alisa to a hearing impaired resource room in Waldwick, New Jersey for one-to-one supplementary academic work with Marge Gorsky, a resource room teacher.

In kindergarten, at Woodside School, Alisa had considerable success in social integration, but her communicative interaction was minimal. Her speech was not understandable, with the exception of about ten words, such as "hat," "outside," "home," and "bathroom." Alisa received the stimulation to communicate and tried to do so, but was seldom able to succeed verbally. She used gestures, mime or other visual communication. The other children tried to understand her and were quite patient when Alisa would utter long strings of unintelligible sounds. While she learned sounds from memory and could act out words, her comprehension of language was poor and she could not understand the teacher without visual cues. She did master all the alphabet letters and sounds and could recognize all the children's names. (R–1, R–2, P–31).

By early April 1982, Superintendent John Manz received staff reports that Alisa's trial placement in kindergarten was not working out. Subsequent conferences, and plaintiff's visits to the alternative placement facilities did not elicit parental consent for out-of-district placement. As a consequence, on October 6, 1983, the CST prepared an "individualized educational program" ("IEP"), calling for her placement in the HI program. The parents refused to consent to such replacement and on November 9, 1983, the Board instituted a "due process" proceeding with the New Jersey Commissioner of Education, to permit the requested replacement.

Such proceeding (hereinafter, "OAL–1") took place on January 17, 18, 19 and 20, 1984, and Judge LaBastille issued her Opinion on February 22, 1984. She held,

Based upon the facts, rather than on hope and speculation, I see no evidence that A.B. can benefit from mainstreaming at this time. If A.B. had already spent two years of total concentration on removing her language deficiency ... the facts and conclusion here might well be different. At the present time, I CONCLUDE that the nature and severity of A.B.'s handicap is such that edu-

cation in regular classes even with one-to-one teaching for all academic subjects cannot be achieved satisfactorily. 20 U.S.C. § 1412(5)(B).

I CONCLUDE that an appropriate free public education under EAHCA can only be provided to A.B. in a program for the Hearing Impaired at this time.

OAL–1, at 27. In so ruling, Judge LaBastille relied upon the following evidence:

(1) the report and testimony of Alisa's first grade teacher, P–2, to the effect that Alisa was falling behind the other children and, as a result, has become less interested and more demanding of the teacher's attention, thus interfering with classroom routine, OAL–1, at 13;

(2) the report and testimony of Dr. Myrna Glick, a clinical and school psychologist, P–33, who stated that Alisa is becoming discouraged and impatient as a result of her handicap, and less happy in school, OAL–1, at 13–14;

(3) the report of Dr. Beatrice Edelstein, a state consultant in hearing impairment, P–35, who stated that Alisa does not comprehend most of what she reads, that she is inattentive and "not an integral part of the class both academically and socially," OAL–1, at 14–15;

(4) the testimony of Board witnesses regarding the Bergen County Hearing Impaired Program, which Judge LaBastille found, gives each child "an opportunity for success on his or her own level," while offering them "protection from rejection or the disinterest of non-handicapped children," OAL–1, at 20; and

(5) her own observations of Alisa's instruction, as a result of which she "noted the level of sound and gesture which A.B.'s one-to-one teacher was required to use to achieve comprehension and communication with A.B. As the Board's experts pointed out, such teaching cannot be carried out in the regular classroom even on a one-to-one or small group basis since it would be disruptive of the learning environment of the other children in the class, especially at the first through third grade levels." OAL–1, at 18.

Judge LaBastille reviewed the testimony of plaintiffs' experts, Dr. Howard Margolis, a special education consultant, and Nanc Fellerman, both of whom advocated a mainstreaming approach, but concluded that Alisa was "not the appropriate child" for such approach, and that "Dr. Margolis' instructional prescriptions are not workable and not fair to the other children in the class." OAL–1, at 15–17.

On March 21, 1984, plaintiffs appealed Judge LaBastille's decision to this court. By stipulation filed September 5, 1984, defendant Saul Cooperman, Commissioner of the New Jersey Department of Education, was dismissed from this action, though he agreed to be bound by the result thereof.

In the meantime, on May 25, 1984, plaintiffs filed a request with Commissioner Cooperman to accelerate the date by which the Board CST would commence preparation of Alisa's IEP for the following school year. This matter, OAL–2, was resolved by stipulation entered into on June 1, 1984, and by August 14, 1984, the IEP was completed.

However, on June 15, 1984, plaintiffs filed a third petition with the Commissioner, requesting (1) non-discriminatory assessment and evaluation methods used in developing Alisa's IEP, and (2) an interim arrangement whereby Alisa would not be retained in the first grade, as the Board planned, but would instead be sent to the second grade for art, music, physical education, lunch and math. After a two-day hearing on July 24 and 25, 1984, the Board offered to stipulate to all of the relief requested by plaintiff, with the exception of placing Alisa in the second grade for math. Plaintiffs rejected this stipulation, but Judge Perselay concluded that the second request for relief made by plaintiffs had, in fact, been satisfied and so "that portion of the matter was considered settled." *See* Order Partially Concluding Special Education Case (Aug. 6, 1984) at 3–4.

As to the first request, Judge Perselay ordered that Alisa's IEP be completed by August 17, 1984 and that nondiscriminato-

ry testing procedures be used; the judge summarized such procedures, based upon the testimony of Dr. Randy Barrett, an expert on education of the handicapped. He concluded that "it would appear that the suggested evaluative criteria ought to be incorporated in the IEP being considered by the parties." *Id.* at 9. He also retained jurisdiction as to the completion of the IEP.

After initial settlement efforts failed, hearings were held on such IEP on October 15 and 16, 1984. Eventually, the parties reached agreement on the IEP, but, by Opinion dated February 1, 1985 (hereinafter, "OAL–3"), Judge Perselay disapproved the program arrived at. He found that such arrangement was unsatisfactory, in that it involved excessive time devoted to transportation back and forth between Woodside School and the hearing impaired resource room attended by Alisa in Waldwick. He thus ordered that the Board "prepare a program and effect a resource room placement" in the Woodside school, utilizing the services of Sharyn Buonpane, a certified teacher of the deaf and hard of hearing already employed, on a part-time basis, by the Board. He also found that the maximum time allowed in such room, two hours, was too little, and ordered such time restriction waived. *See generally* OAL–3, at 15–16. Such solution, Judge Perselay held, would remedy the fragmentation in Alisa's schedule, *see id.* at 7, and would result in the required nondiscriminatory evaluation of her. *Id.* at 16. He did, however, deny plaintiffs' request to observe Alisa in the classroom. *Id.* at 11.

By Consent Order entered into on March 7, 1985, defendant was permitted to file a counterclaim in this action, challenging OAL–3. Both this counterclaim and plaintiffs' complaint are now before the court for determination. At issue is whether Alisa can receive an appropriate education in the regular educational environment, with the use of supplementary aids and services. 20 U.S.C. § 1412(5)(B). Plaintiffs argue that she can, and that she ought to remain in her Franklin Lakes classroom, as modified by certain scheduling accommodations and supplemented by a resource room. In particular, plaintiffs request that the following program be implemented:

1. [Alisa] remain a part of her normal class for homeroom, gym, art, music, lunch and free periods.

2. [Alisa] work with Sharon [Buonpane] (A certified teacher of the hearing impaired, and a certified speech therapist for the hearing impaired, who is already an employee of Franklin Lakes) in a one-to-one resource room setting while the other students are attending academic classes.

3. The same certified teacher could be present with [Alisa] when the regular class divides up into small group academics thereby providing an academic learning interaction with her peers, and a sense of belonging without hindering other class members.

4. [Alisa] would eventually be mainstreamed for an increasing percentage of each academic day.

Final Pretrial Stipulation at 7 (Plaintiffs' Factual Contentions). Plaintiffs further argue that Alisa has been the victim of inadequate and discriminatory evaluation by the Board. *Ibid.* Defendant, however, argues that due to her impairment, Alisa must receive one-to-one instruction, that such instruction is a poor program, because it is "exhausting to both teacher and pupil," boring and lacking in variety, and would not expose Alisa to learning from her peers; it is also distracting to other children. Supplemental speech therapy and the resource room are argued to contain many of the same problems; they also tend "to fragment Alisa's school day" and to "focus attention of Alisa's classmates on her as 'different.'" The Board argues that mainstreaming compounds Alisa's language problems, and that such problems would be remedied by placement in the Bergen County Hearing Impaired Program. *Id.* at 9–10.

As Judge Perselay points out, "[t]his case truly represents the philosophical differences in how auditorially

handicapped children are to be taught." OAL–3, at 6. Although the EAHCA expresses a preference for the mainstreaming advocated by plaintiffs, *see* 20 U.S.C. § 1412(5)(B), *cited in Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 181, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982); *see also Wilson v. Marana Unified School District of Pima County,* 735 F.2d 1178, 1183 (9th Cir.1984); *Department of Education, State of Hawaii v. Katherine D.,* 727 F.2d 809, 817–18 (9th Cir.1983), citing *Tokarcik v. Forest Hills School District,* 665 F.2d 443, 458 (3d Cir.1981), *cert. denied,* 458 U.S. 1121, 102 S.Ct. 3508, 73 L.Ed.2d 1383 (1982); *Doe v. Brookline School Committee,* 722 F.2d 910, 916 (1st Cir.1983), citing *Concerned Parents v. New York Board of Education,* 629 F.2d 751, 754 (2d Cir.1980); Note, *Enforcing the Right to an Appropriate Education,* 92 Harv.L.Rev. 1103, 1119–22 (1979); *Roncker on behalf of Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 76 L.Ed.2d 171 (1983), the inquiry now before the court is, of course, a factual one: can Alisa receive an "appropriate" education in her neighborhood school, or is "the nature or severity of [her] handicap … such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily?" 20 U.S.C. § 2412(5)(B). *See, e.g., Rowley, supra,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3038 n. 4; *Wilson, supra,* 735 F.2d at 1183 (mainstreaming must be balanced with primary purpose of EAHCA, which is provision of an appropriate education), citing *Johnston by Johnston v. Ann Arbor Public Schools,* 569 F.Supp. 1502, 1508–09 (E.D.Mich.1983). In conducting such inquiry, the court is aware that it does not here seek the *best* possible education for Alisa—only one which complies with the mainstreaming provisions, and the limitations on judicial review, set forth in the EAHCA. *See, e.g., Springdale School District # 50 of Washington County v. Grace,* 693 F.2d 41, 43 (8th Cir.1982). Moreover,

> In a case where the segregated facility is considered superior, the court should determine whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act. Framing the issue in this manner accords the proper respect for the strong preference in favor of mainstreaming while still realizing the possibility that some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting.

*Roncker, supra,* 700 F.2d at 1063. However, a decision not to mainstream may not be based upon a philosophical disagreement with mainstreaming concept endorsed by the EAHCA. *Id.* at 1063, citing *Campbell v. Talladega County Board of Education,* 518 F.Supp. 47, 55 (N.D.Ala.1981).

■ With these principles in mind, the court proceeds to evaluate the evidence before it. It does so mindful of the standard of review by which it is bound. That standard is set forth in 20 U.S.C. § 1415(e)(2), which states, in pertinent part,

> In any action brought under this paragraph, the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

The Supreme Court has made clear that, while this language requires the court to conduct a *de novo* review of the state administrative decision at issue, *see Rowley, supra,* 458 U.S. at 205, 102 S.Ct. at 3050, citing S.Conf.Rep. No. 94–455, p. 50 (1975); 121 Cong.Rec. 37416 (1975) (remarks of Sen. Williams), it also "carries with it the implied requirement that due weight shall be given to these proceedings." 458 U.S.

at 206, 102 S.Ct. at 3051. *See generally School Board of the County of Prince William, Va. v. Malone*, 762 F.2d 1210, 1217–18 (4th Cir.1985); *Roncker, supra*, 700 F.2d at 1062. Hence, the EAHCA is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. Indeed, there is "nothing in the Act to suggest that ... [Congress] intended that reviewing courts should have a free hand to impose substantive standards of review which cannot be derived from the Act itself." *Ibid.*

That, of course, is not the case here, where the mainstreaming sought by plaintiffs is, in fact, a primary, substantive goal of the Act. Nonetheless, the court pursues its analysis of the facts herein by reference to the "twofold inquiry" mandated by *Rowley*. "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" 458 U.S. at 206–07, 102 S.Ct. at 3051.

DISCUSSION

A. *Compliance with Procedures*

■ In his first decision, and after hearing the testimony of Dr. Randy Bennett, Judge Perselay concluded that, to that point, Alisa had not been adequately evaluated. He wrote:

> Dr. Bennett ... testified to the fact that a nondiscriminatory assessment of A.B. in this case falls short in its goal because of utilization of tests which were inappropriate, reliance on an inadequate statement of conditions which existed at the time of testing, failure to state that the personnel performing the test were trained specially to test hearing impaired students, and failure to administer tests validated for the hearing impaired. Additionally, there was no systematic record of behavior functioning in other environments and that the preferred mode of communication of the student was not considered. Specifically, Dr.

Bennett found that the current level of educational functioning was not tested and that the results upon which consideration was being given were invalid because they were two years old at this time. The only assessment indicator was teacher judgment or evaluation.

August 6, 1984 Opinion at 7. Judge Perselay accordingly ordered that proper evaluative criteria be used to cure these problems. *Id.* at 9. Ultimately, he found that the IEP arrived at would be sufficient to evaluate Alisa *"when the evaluation is performed by persons specially trained in evaluating the deaf and hearing impaired,* so that the evaluation reflects the child's performance and not a measure of her impairment."* OAL–3, at 16, (emphasis in original), citing N.J.A.C. 6:28–2.5(a)(5).

While this holding is not a subject of defendant's cross-appeal, and, indeed, is not even disputed, it is probative of defendant's compliance with the procedural requirements of the EAHCA. In particular, the EAHCA mandates a "free appropriate public education" in conformity with each child's IEP. 20 U.S.C. § 1401(18)(D). The IEP, in turn, is to include

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objections, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19). *See Rowley, supra*, 458 U.S. at 181–82, 102 S.Ct. at 3037–38. Moreover, the Act requires that the state establish

> procedures to assure that testing and evaluation materials and procedures utilized for the purposes of evaluation and placement of handicapped children will

be selected and administered so as not to be racially or culturally discriminatory. Such materials or procedures shall be provided and administered in the child's native language or mode of communication, unless it clearly is not feasible to do so, and no single procedure shall be the sole criterion for determining an appropriate educational program for a child. 20 U.S.C. § 1412(5)(C). *See also* 34 C.F.R. § 300.532. Additionally, the regulations promulgated pursuant to the EAHCA require that a full evaluation occur prior to placement of a handicapped child in a special educational program. 34 C.F.R. § 300.-531. Interestingly, such evaluation is to be conducted in line with the recommendations of Dr. Bennett. 34 C.F.R. § 300.532(a)–(f).

Viewed in light of these provisions of law, defendant's evaluation of Alisa appears to fall woefully short. Thus, although goals were established for Alisa in January, 1983, *see* R–1, Classification Conference Report, at 4, when on April 29, 1983, plaintiffs met with the CST, the latter informed the Bonadonnas "that we did not feel that the placement [in regular kindergarten] was successful in terms of giving Alicia [sic] the kind of language experience and academic progress and intellectual process that was due her and that we felt that other placements should be explored." Tr. (1/18/84) at 199:11–16 (testimony of Dr. Myrna Glick). This evaluation was not, apparently, based upon the goals set forth approximately four months earlier, as it should have been. *See* 20 U.S.C. § 1401(19)(E); 34 C.F.R. § 300.346(e). Indeed, according to the record now before the court, only three documents could have been considered by the CST in arriving at the conclusion that, in the words of Judge LaBastille, "A.B.'s trial placement in kindergarten ... was not working out." OAL–1, at 12. These were the January 24, 1983 report of speech pathologist Rose Walcott (R17), the kindergarten progress report of teacher Doris Heuerman (R1) and the evaluation of Alisa performed by the New York League for the Hard of Hearing on February 1, 1983 (P25). These reports did not support the CST's conclusion: Ms.

Wolcott confirmed that Alisa had "an oral communication problem," but concluded

Prognosis for improvement in communicative ability with intensive speech, language and hearing therapy is good based upon Alisa's verbal thinking skills, the amount of improvement shown, her motivation and enthusiasm in thinking, and the parental support and cooperation.

R17, at 5. Her kindergarten progress report indicated that, while Alisa's verbal development had been minimal, she was happy. R1 (kindergarten progress report). By the end of the year, she would get an evaluation that indicated far greater progress: she would know the letters of the alphabet and their sounds and the names of the children in the class; she would have a twenty-one word sight vocabulary, a recognition of numbers, an ability to add and subtract, and a knowledge of concepts. She had learned to communicate with the other children in the class. (R2). Finally, the New York League for the Hard of Hearing, while finding Alisa to be three years below her chronological age in vocabulary, with "very poor" expressive language skills, also recommended "that Alisa receive intensive daily individual or small group instruction in a resource room, by a teacher of the hearing impaired, with concentration on acquiring the entry skills she needs in order to learn in a regular classroom .... It is equally important that she remain with her regular classmates for all the non-academic subjects, i.e., art, music, gym, lunch, recess. This will provide her with the benefit of normal hearing peer relationships and interactions." P25, at 5.

More important than these results, which contradict the conclusion of the CST, is the methodology employed by defendants in arriving at their conclusions: they were based almost solely upon observation. *See, e.g.,* R17, at 2 ("Assessment consisted of primarily non-standardized tasks and procedures as well as structured observation of the child's communicative behaviors in the therapy setting."). No scientific test results seem to have been considered by the CST in reaching its conclusion that Alisa's

IEP should be changed; moreover, one procedure seems to constitute the sole criterion for determining her program. This mode of evaluation is violative of the EAHCA and, as Dr. Bennett pointed out, does not approach compliance with its regulations, 34 C.F.R. § 300.532: there is no evidence, for example, that any validated tests were performed, to test Alisa's aptitude rather than her handicap; that all areas of her hearing impairment were assessed; or that anyone on the classification team was an expert in the education of the hearing impaired. Rather, the CST's April, 1983 assessment was based upon observation alone.

This is a pattern that repeated itself. Thus, the October 6, 1983 IEP review of Alisa, based upon which the CST continued to recommend that Alisa be placed in the Bergen County Hearing Impaired Program, concerned itself primarily with Alisa's first month of the first grade. No standardized psychological or education tests were administered; indeed, the entire substance of the report is described as "Alisa's performance in first grade, as reported by Mrs. Kellerman, her first grade teacher." Thus, but one procedure—teacher evaluation—was utilized. Such procedures lacked scientific validity, in that they were not systematic, were limited to a narrow range of behavior and were not confirmed by recent test data, and thus tended toward discriminatory evaluation, i.e., evaluation that is biased, in this case, against deaf children. See Tr. (7/25/84) at 5:8–12, 13:17–21, 19:24–20:4, 28:5–30:10. (testimony of Dr. Bennett). Moreover, such evaluation, documenting Alisa's language problems, and need for one-to-one instruction, was based upon but one month of observation. The court finds that this method of assessment does not meet the requirements of the EAHCA, or its regulations.

Finally, on June 7, 1984, the CST conducted an IEP Annual Review based upon which the CST recommended that Alisa remain in the first grade; as discussed, supra at 405, the parties ultimately agreed that, on an interim basis, she would attend second grade for homeroom, lunch, recess, art, physical education, library and music, and that her remaining subjects would be taught in the first grade, a resource room or a combination thereof, with speech and language instruction at the Woodside Avenue School. P38, at 12. The report at issue, however, does not indicate that it was based upon anything other than observations by Mrs. Kellerman, the first grade teacher (P25, P26, P27), as well as by Dr. Glick (P33), psychologist John Caliso (P32), and State Hearing Impairment Consultant Dr. Beatrice D. Edelstein (P35). The latter three, again, evaluated Alisa early in the course of first grade. And again, none utilized techniques other than simple observation. As a result, the CST report was quite imprecise: while it noted that Alisa was below first-grade level in reading comprehension, written expression and spelling, it did not say how far below grade level her performance was. P38, at 3. Oral comprehension was stated to be merely "below her classmates," clearly not an adequate measure. And, while Alisa was said to be performing at grade level in math, handwriting, art and in some aspects of physical education, other areas were not even evaluated. P38, at 3–4.

These types of reports constituted the basis for the IEP ultimately approved by Judge LaBastille. As such, the IEP did not fulfill the requirements of the EAHCA; nor has the Board justified its placement of Alisa in the Hearing Impaired Program by appropriate preplacement testing. In these senses, the procedural requirements of the EAHCA have been left unfulfilled; the IEP proposed by the Board may be rejected on this ground alone. See Rowley, supra, 458 U.S. at 206–07 n. 27, 102 S.Ct. at 3051 n. 27.

B. Sufficiency of the IEP

█ The court nonetheless moves on to examine the sufficiency of the IEP approved by Judge LaBastille. In so doing, it recognizes that, normally, it would be required to give "due weight" to her decision; here, however, such decision is, essentially, contradicted by the subsequent Opinion of Judge Perselay, in OAL–3. The latter has

also been appealed to this court, on other grounds, and, technically, the court could affirm both decisions, by holding that the IEP proposed by the Board was appropriate, as was Judge Perselay's interim order.[1] However, the two rulings represent such different approaches to the same problem that the court cannot help but find their inconsistency to be an indication that the state is of two minds about the problem here presented. Deference is, in such situation, inappropriate.

Moreover, the court finds the fact that Judge Perselay arrived at a conclusion so at odds with that reached by Judge LaBastille probative, just as it found probative his findings regarding the inadequacy of the evaluations of Alisa performed prior to his August 6, 1984 Order. *See supra* at 408. Such findings are here indicative of the fact that Judge LaBastille's ruling was made at a time much earlier than the time at which Judge Perselay began to handle the case. And, the court believes, their findings so reflect; Judge Perselay had a more complete record before him, which record supported a partial mainstreaming approach. The evidence presented to Judge LaBastille, on the other hand, was tentative, premature and thus, inconclusive.

Thus, for example, just as Alisa ended up making enormous progress in kindergarten, notwithstanding the dire forecasts of the CST to the contrary, *see supra* at 409, first grade also proved to be a success in certain respects. Hence, Judge LaBastille found that Alisa was "less happy" in school than before, as a result of her "frustration in the classroom from an inability to understand what appears to be easy for other children to understand," and other "signs of deteriorating emotional adjustment." OAL-1, at 14. Such finding was based upon Dr. Glick's testimony, itself based upon observation "on several occasions" of

Alisa during the first few months of the first grade (P33), at which point, it should be noted, certain telex equipment designed to help Alisa was not working. By the end of that year, the CST could write:

> In addition to her intelligence and visual awareness, Alisa has many positive qualities which have contributed to her ability to adjust well socially and emotionally to her present placement. She is a friendly, sociable child who has made many friends in her present class. She plays after school with these children and is invited to birthday parties and other social events. At these functions, she reportedly relates very well to her peers. In school, Alisa's classmates have been extremely thoughtful of her as a person and of her special needs. Often, they are very protective and solicitous. She is an emotionally sturdy and adaptive child who appears to have coped well even though her program requires movement outside the school. Whereas at the beginning of the school year, she smiled infrequently and interacted minimally with her peers, she now smiles often and makes positive contacts with classmates via affectionate physical contact and gestures. Occasionally, she utters short phrases or sentences as well.

P38, at 2. Thus, the Board's vociferous support for Judge LaBastille's decision, upholding an IEP prepared for a conference held approximately one month after Alisa began the first grade, takes no account of Alisa's later development.

That development has been significant. By the end of first grade, Alisa was performing at grade level in math, handwriting, art and physical education, and had "made amazing strides" in the library. P38 at 3, 4.[2] Indeed, while Judge LaBastille found her to show "signs of impatience when [she could not] participate," OAL-1,

---

1. Of course, as the Board points out, if the decision of Judge LaBastille is affirmed, that of Judge Perselay is rendered moot, since placing Alisa at the Bergen County Hearing Impaired Program would end the necessity for any interim relief. *See* Defendant's Brief at 123.

2. The importance of "yearly advancement to higher grade levels" is emphasized by the Supreme Court in *Rowley,* 458 U.S. at 203 and n. 25, 102 S.Ct. at 3049 and n. 25, with respect to whether the education being received is "appropriate."

at 14; *see also id.* at 13, six months later, the CST reported that, "when present for a story, [Alisa] follows with fair attention, even though she may not understand." P38, at 4. And, while her language skills lagged behind those of her classmates, and presented "very significant educational handicaps," *ibid.*, the CST reported that

> She is improving in her ability to convey a message. She speaks on [sic] short phrases or sentences and will make her needs known. Examples of Alisa's spontaneous speech in the classroom are: "My duck has a boo-boo," or "Dad graduate." She is less hesitant and much more verbal in a small group, where she may say, "Rachel get out Wolcott chair." Alisa uses telegraphic speech. In a large group she is inhibited, but will answer a question. If she is speaking about a subject she knows well, she can speak in a complete sentence including a prepositional phrase.

P38, at 3. The CST reported that Alisa had improved in her ability to answer "who?" and "what?" questions, *cf.*, OAL–1, at 13, and her first grade teacher stated that her "word recognition from her reader is very good." P25.

All of this information, and other data akin to it, reveal a child who is learning in a classroom setting, and in some areas, is on par with her peers. Her social adjustment is improving and her classmates have learned to communicate with her. Such information was, of course, unknown to Judge LaBastille, who was presented with the reports of a little girl apparently having a hard time adapting to the first grade—not an unknown phenomenon.

Plaintiffs admit Alisa's language problems, and her need for one-to-one teaching in certain subjects. However, they believe that such teaching is a "supplementary aid or service," which ought to be provided Alisa in connection with a regular classroom education. *See* 20 U.S.C. § 1414(5)(B). Their belief is extremely important for, as Ms. Gorsky, a specialist in teaching the hearing-impaired, who worked with Alisa in the Resource Room for the Hearing-Impaired in Waldwick, stated

> It is my philosophy that a child will do best when the parents support the program the child is in. Since the Bonadonna's are emphatic about their opposition to schools for the deaf, a program should be provided that will allow Alisa to be with her hearing classmates for non-academic subjects and receive individual and small group instruction in the academic areas.

R22. Other educational personnel familiar with the hearing impaired and with Alisa recommended at various times that she be mainstreamed. *See, e.g.*, P14, at 3 (report of Mary T. Savarese, Preschool Hearing Impaired Program, 5/30/82) (recommending that she be mainstreamed for kindergarten); P11, at 2 (report of Sharyn L. Buonpane, 6/10/82) (same). Thus, the staff of the New York League for the Hard of Hearing examined Alisa on February 1, 1983, during kindergarten, and recommended that she

> ... receive intensive daily individual or small group instruction in a resource room by a teacher of the hearing impaired with concentration on acquiring the entry skills she needs to learn in a regular classroom .... It is equally important that she remain with her regular classmates for all the non-academic subjects, i.e., art, music, gym, lunch and recess. This will provide her with the benefit of normal hearing peer relationships and interactions. It is also recommended that her parents and teachers reassess her ability and level of functioning after she starts first grade. The degree to which she is mainstreamed for academic subjects during any school year should be dependent on her skill level at that time.

P25, at 5. In September, 1983, Alisa was seen by personnel at St. Joseph's Hospital and Medical Center, in Paterson, New Jersey, as part of a psychological and developmental pediatric evaluation. School psychologist Louis Hochberg concluded,

At this time it does not appear ... that Alisa has sufficient communications skills to permit her to receive the bulk of her educational training in a mainstream setting. ... it would appear that Alisa would benefit most from an educational program where she receives speech and auditory educational training, language, reading, and beginning math in a resource room or self-contained class for the hearing impaired provided by a teacher of the hearing impaired. In order to address her social and emotional needs, it is most important that she be provided with opportunities to remain with normal hearing peers for nonacademic subjects and possibly short periods of the day when reinforcement is provided in a regular class setting.

R20, at 4. Dr. Joseph A. Holahan, a developmental pediatrician, agreed. He wrote ... I did not think that she will be able to learn satisfactorily in a regular classroom setting for academic subjects. I think that for academic subjects, she should receive her instruction from a certified teacher for the hearing impaired. She should continue to receive auditory training, language therapy and speech therapy in addition to the special educator in academic areas. It is most important that for nonacademic subjects in school areas, such as art, gym, lunch, recess and even possibly music, that Alisa be "mainstreamed" into a normal setting with peers of her age. This is most important if she is to continue to show the healthy emotional and social growth that she has over the past year. Enrollment in an educational setting that is too strongly oriented toward special needs children, or in a setting where she would be placed with special needs children in nonacademic subjects would not allow Alisa to experience the most beneficial opportunity for healthy emotional and social growth and development.

R19, at 3. And, on October 22, 1983, Alisa was examined by Nancy M. Lebo, of the Cedar Hill Learning Disability Center of Wyckoff, New Jersey. Ms. Lebo concluded that Alisa should be mainstreamed to the maximum extent possible, but that her academic progress ought not be hindered. "Ideally," she wrote, "Alisa should receive mainstreaming and special services in the neighborhood school." R18, at 4.

At the hearing before Judge LaBastille, two experts testified on plaintiffs' behalf. Nanc Fellerman, a speech and language pathologist and consultant for programs for the handicapped, examined Alisa on January 10, 1984, and reviewed all of the aforesaid reports. She agreed with the Board that direct one-to-one instruction was the optimal method of teaching Alisa, particularly in light of the fact that Alisa's hearing problem was not discovered until the age of three. Tr. (1/20/84) at 102:10–103:198. Having examined the various proposals, however, she found the Hearing Impaired Program to be inferior, as affording Alisa less speech therapy. *Id.* at 98:13–102:9. Ms. Fellerman recommended the following for Alisa:

Using all of the backgrounds that I have come from and the reports that I have made available to me and my direct contact with Alisa and from her parents, I believe in order to meet all of her needs that the regular classroom and mainstreaming is paramount for her because she can function in many of the nonacademic areas, because peer relationships with children who do not necessarily have stereotyped behaviors of hearing impaired, we learn from our peers and placed in an isolated self-contained class with children who have the same or more problems as Alisa, she will not have an opportunity to function in the real world. I think that is very important.

I think that it is also very important that she has special teachers to work with her on her academic skills because there is no denying she had a hearing loss. I think that she should continue work with speech and language pathologists and I know that the Bonadonnas have it twice a day, but given that in my testing, I saw that she had learned from the speech and language pathologist. The big problem now is to understand what's in there and

that your enabling her to get it out, so I would recommend that she receive as much speech therapy on an individual basis and then move it over to a small group basis as possible. I would like to see her get her academic skills from someone who is trained and working with the hearing impaired who knows the techniques of teaching and looking and capitalizing on those strong fields that she shows. I would like to see that teacher when possible integrated within the regular class because many of our normal children have practicing difficulty, that's understanding what is said to her and have problems in understanding auditorily and that's what I would like to see for Alisa.

Tr (1/20/84) 105:6–106:13. Ms. Fellerman believed that plaintiffs had suggested a very viable program, and that Alisa ought not be educated in an institution for the hearing impaired

because she shows abilities which are greater than her chronological age. In other areas she shows socialization skills which are appropriate and if I have my choice in mainstreaming a child than placing a child in a secluded environment, I would also have taught the children in mainstreaming.

Tr (1/20/84) 132:2–9.

Also testifying for plaintiffs was Dr. Howard Margolis, a school psychologist, learning disability teacher and educational consultant in special education and reading. Dr. Margolis did not meet Alisa, but he reviewed her files. He pointed to the following as data in support of the proposition that Alisa had qualities that would enable her to be mainstreamed.

Here are some of the dycriptors (phonetic) which are used. She is most attentive, she is happy, and she relates well, she is anxious to please, she attempts to lip read, she relies heavily on and visually on concrete materials which means she is learning how to compensate. She has age of 7 which is older than her chronological age, she has an I.Q. of 113 which certainly puts her above her average

range, her prospective skills are well developed. She applies good [cognitive] strategies, she is bright, normal non-verbal intellectual potential, her ability to formulate reproduction on the Stroll Test age appropriate and socially and emotionally Alisa presents a happy, well related child, who is most compliant and eager to please.

Tr. (1/20/84) at 149:3–19. Dr. Margolis also highlighted the benefits which Alisa is deriving from one-to-one instruction, id. at 150:2–8, the fact that Alisa apparently has many friends, id. at 150–51, the subjective reports of Ms. Wolcott, Ms. Gorsky and plaintiffs that Alisa is making progress, id. at 152:3–11, the quotation from Ms. Hochberg's report, to the effect that "There is no doubt that Alisa is an [intellectually able] child who is benefiting from social and cognitive stimulation of hearing children," id. at 152:17–19, and the report of Janet Purn of Newark Beth Israel Medical Center that Alisa is making progress under the tutelage of trained speech therapists. Id. at 152:19–153:3, citing R.21. Dr. Margolis concluded that Alisa ought to be mainstreamed, that she was an ideal candidate for mainstreaming and that mainstreaming was important in order that she not become isolated.

Judge LaBastille seemed to ignore much of this evidence, concluding that the testimony of Fellerman and Margolis was essentially based upon their "particular educational philosophy," and not on evaluation. OAL–1, at 21. Such is not the case: rather, the expert opinions presented by plaintiffs address the question of to what extent Alisa is a particularly good candidate for mainstreaming, though others might not be. Moreover, as discussed, supra, the reports and evidence upon which the Judge relied were, to a great degree, rendered obsolete by the June, 1984 report of the Board's CST. Finally, particularly in light of the presumption of mainstreaming embodied in the EAHCA, it cannot be said that the Board has come forward with nearly adequate data to justify the IEP they propose.

Much of what the Board contends, and Judge LaBastille found, is absolutely correct, and, indeed, undisputed. Alisa requires one-to-one teaching, and does not have the language skills to be fully mainstreamed. The court also agrees that a program of one-to-one instruction, alone, would be boring for Alisa, draining for her teacher, and, if conducted within the confines of the classroom, distracting to other children. However, it can no longer be said that Alisa does not benefit from regular classroom instruction or that her attention is not sustained; moreover, the limited one-to-one instruction now available to Alisa in the resource room means that she is exposed to a variety of instructional settings, lessening the burden on other children, if any, by having her in the classroom only for those subjects not frustrating to her, and bringing her into contact with staff expert in teaching the hearing impaired. In sum, the existing educational arrangement is almost ideal: while it does not eliminate stigma, it lessens it by maximizing mainstreaming; while it may sacrifice some educational quality for social values, it provides expert instruction in those substantive areas most crucial to Alisa's intellectual development. The facts of record indicate that such development is a reality, due to the energy and resolve of plaintiffs, the dedication and compassion of those professionals called upon to teach Alisa, and Alisa herself, obviously an extraordinary little girl.

█ For all of these reasons, the court finds, by a preponderance of the evidence:

(1) that Alisa can receive an appropriate education in her neighborhood school;

(2) that the nature of her disability is not such that education in regular classes, with the use of the supplementary aids and services available in the resource rooms, cannot be achieved satisfactorily; and

(3) that the benefits of partially mainstreaming Alisa outweigh the problems caused thereby.[3]

For these reasons, and based upon the strong public policy favoring mainstreaming, the decision of Judge LaBastille is hereby reversed. Alisa's current educational program will, therefore, remain in effect. However, while the court might agree with Judge Perselay that Alisa would be *best* served by a resource room located in her Franklin Lakes neighborhood school, so that her day would be less "fragmented," with less time devoted to transportation to and from Waldwick, as well as greater possibilities for one-to-one instruction in the resource room and in class, neither Judge Perselay, nor this court, can say that without such resource room, Alisa will be deprived of the "free appropriate public education" to which she is entitled. 20 U.S.C. § 1412(1). Indeed, given Alisa's rapport with Ms. Gorsky and Ms. Wolcott, she is, arguably best left under their extremely able and oft-complimented, tutelage, rather than shifted to Ms. Buonpane, who has never taught young hearing-impaired children, or set up the type of resource room now available to Alisa. *See* Tr. (10/15/84) at 108:1–10. As discussed above, the current educational arrangement is an entirely "appropriate" one for Alisa; that it may not be the best one is not a problem within the purview of the EAHCA. *See, e.g., Grace, supra,* 693 F.2d at 43. *See generally Rowley, supra,* 458 U.S. at 208, 102 S.Ct. at 3052 ("... once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.") (school district affording deaf child an appropriate education may not be ordered to provide her with a sign-language interpreter). Where, as here, the evidence of record does not demonstrate, by a preponderance, that a change in resource rooms would necessarily be best for Alisa, the court is even less likely to interfere with what appears to be a rather successful education program, reasonably calculated to enable Alisa to receive the educational benefits

**3.** It should be noted that cost is not, apparently, a factor in this decision, as it may be. *See, e.g., Roncker, supra,* 700 F.2d at 1063, citing *Age v.*

*Bullitt County Schools,* 673 F.2d 141, 145 (6th Cir.1982)

assured her by the Act. For this reason, Judge Perselay's February 1, 1985 Order is also reversed; it awards relief beyond the scope of the Act.

 It only remains to consider plaintiffs' application for compensatory and punitive damages and attorney's fees. The latter are clearly barred; attorney's fees are unavailable under the EAHCA. *See generally Smith v. Robinson,* — U.S. ——, 104 S.Ct. 3457, 3474, 82 L.Ed.2d 746 (1984). Plaintiffs' contention that they should nonetheless be available under the Rehabilitation Act, 29 U.S.C. § 794, has been explicitly rejected by the Supreme Court, *id.* at 3471–74, while any claim that might arise under the attorney's fee provision of the Civil Rights Act, 42 U.S.C. § 1988, is barred by plaintiffs' failure to allege or prove a due process violation. *Id.* at 3468–71 (barring award of attorney's fees for equal protection violation, but leaving open the question of the availability of fees for a due process violation, not here found to exist). *See also Manecke v. School Board of Pinellas County, Florida,* 762 F.2d 912, 919–20 (11th Cir.1985) (attorney's fees available under § 1988 where "the local educational agency deprives a handicapped child of due process by effectively denying that child access to the heart of the [EAHCA] administrative machinery, the impartial due process hearing"), citing *Rose v. Nebraska,* 748 F.2d 1258, 1263 (8th Cir.1984); *Teresa Diane P. v. Alief Independent School District,* 744 F.2d 484, 491 (5th Cir.1984); *Victoria L. v. District School Board,* 741 F.2d 369, 372 (11th Cir.1984). Plaintiffs do not, and cannot, argue that they have been deprived of their access to the EAHCA administrative machinery; indeed they have availed themselves of it three times. Nor do they set forth any other independent basis for a due process violation. *See Austin v. Brown Local School District,* 746 F.2d 1161, 1165–66 (6th Cir.1984). As such, no violation of the Civil Rights Act is alleged, *see Smith v. Robinson, supra,* 104 S.Ct. at 3468 n. 11 (the EAHCA may not be claimed as the basis for a § 1983 action), and attorney's fees may not be collected thereunder.

More problematic is plaintiffs' claim for damages. Whether damages are available under the EAHCA is a question left open both by the Supreme Court, *Smith v. Robinson, supra,* 104 S.Ct. at 3473–74 n. 24, and by the Court of Appeals for the Third Circuit. *DeLeon v. Susquehanna Community School District,* 747 F.2d 149, 150 n. 1 (3d Cir.1984). *But see Burlington School Committee v. Department of Education of Massachusetts,* — U.S. ——, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985) (retroactive reimbursement for amounts expended by parents during the pendency of EAHCA proceedings is allowed, but does not constitute damages). However, as the Supreme Court noted in *Smith,* "[w]ithout expressing an opinion on the matter, courts generally agree that damages . . . are available under the [EAHCA] only in exceptional circumstances." 104 S.Ct. at 3473–74 n. 24, citing *Miener v. Missouri,* 673 F.2d 969, 978 (8th Cir.), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Anderson v. Thompson,* 658 F.2d 1205 (7th Cir.1981); *Monahan v. Nebraska,* 491 F.Supp. 1074, 1094 (D.Neb.1980), *aff'd in part and vacated in part,* 645 F.2d 592 (8th Cir.1981); *Hurry v. Jones,* 560 F.Supp. 500 (D.R.I.1983), *aff'd in part and reversed in part,* 734 F.2d 879 (1st Cir.1984); *Gregg B. v. Board of Education,* 535 F.Supp. 1333, 1339–40 (E.D.N.Y.1982). *See also Manecke, supra,* 762 F.2d at 915 n. 2, citing *Powell v. DeFore,* 699 F.2d 1078, 1081 (11th Cir.1983); *Parks v. Parkovic,* 753 F.2d 1397, 1407–08 (7th Cir.1985); *Colin K. by John K. v. Schmidt,* 715 F.2d 1, 10 (1st Cir.1983), citing *Doe v. Anrig,* 692 F.2d 800, 811–12 (1st Cir.1982); *Marvin H. v. Austin Independent School District,* 714 F.2d 1348, 1355–56 (5th Cir.1983). Such "exceptional circumstances" are said to exist where "(1) the school district's placement of the child would endanger the child's physical health; and (2) where the school district 'acted in bad faith by failing to comply with the procedural provisions of [the EAHCA] in an eggregious fashion.'" *Manecke, supra* 762 F.2d at 915, quoting

*Anderson, supra,* 658 F.2d at 1213–14. *See also Miener, supra,* 673 F.2d at 980.

■ Here, there is no claim whatsoever of damages incurred by the parents on an interim basis; indeed, the "stay put" provision of the EAHCA, 20 U.S.C. § 1415(e)(3), has kept Alisa in the public schools at *no* extra cost to plaintiffs. *Cf., Burlington School Committee, supra.* Nor do plaintiffs claim either that the Board's proposed placement of Alisa would endanger her health or, as noted *supra* at 416, that the Board has failed to comply with the procedural provisions of the Act in an eggregious fashion. Rather, plaintiffs argue that the Board acted in bad faith in two senses: first, by depriving Alisa of a working telex machine, and second, by depriving her of the services of Sharyn Buonpane. *See* Plaintiffs' Brief at 14. The former was an unfortunate error which, the court agrees, skewed Judge LaBastille's analysis of Alisa's capacity to be mainstreamed. There is no claim or proof, however, that the Board either intended to so inconvenience Alisa, or did not act as expeditiously as possible in remedying this problem, once identified. Nor, given the court's holding, *supra,* at 415–416, is there any basis for claiming that the Board's decision not to provide Alisa with Ms. Buonpane as a teacher, was made in bad faith.

■ In any event, the bad faith acts attributed to defendant by plaintiffs do not constitute a failure to comply with the provisions of the Act in an eggregious fashion,

as required by the cases. Indeed, they do not constitute procedural failings at all.[4] Moreover, the damages which plaintiffs seek are by way of attorney's fees only, *see* Plaintiffs' Brief at 7–8; while the court finds it unfortunate that plaintiffs have had to pay such fees to vindicate their child's rights,[5] it has already held such fees unavailable. *See supra* at 416. Plaintiffs may not receive in damages that which the Act has specifically denied them as attorney's fees. Finally, the court has significant doubts as to the availability of punitive damages in cases such as these. *See, e.g., Marvin H., supra,* 714 F.2d at 1356. However, in any event, it does not find that the Board has, in any way, acted in bad faith in this matter. To the contrary, the Board's views throughout have been motivated by a genuine interest in doing what is best for Alisa, as well as for the other children for whose education it is responsible. Indeed, even Judge Perselay so found. *See* OAL–3, at 6. The court here finds such views to be supported by the evidence of record, in light of the legal requirements of the Act. It does not, however, cast any aspersions upon the Board's motivations, which appear to be selfless, pure and in the highest tradition of the teaching profession. For all of these reasons, plaintiffs' request for damages is denied.

## CONCLUSION

Although the court is frequently called upon to choose between conflicting expert

4. The court has, of course, found certain procedural failings in the method of evaluation used for Alisa. *See supra* at 408–410. However, it does not find such failings to be in bad faith; for example, the Board claimed that it did not utilize standardized tests because they were "artificial" and would not sufficiently credit Alisa's determination and drive. *See* Tr. (7/25/84) at 27:24–28:17. Indeed, the Board consistently brought significant resources to bear on Alisa's evaluations; contrary to plaintiffs' contentions, such resources included Ms. Buonpane, *see* R1, or other hearing-impaired specialists. *See* P38 (Ms. Gorsky listed as member of CST). More importantly, the eggregious procedural failings that give rise to damage actions under the EAHCA, like those which give to due process violations, actionable under 42 U.S.C. § 1983, should go to the very essence of the procedures man-

dated by the EAHCA: the right to a full and fair due process hearing. *See Anderson v. Thompson, supra,* 658 F.2d at 1211, *cited in Id.* at 1214. That right was not infringed at all here, let alone eggregiously infringed. Thus, although the IEP was procedurally flawed by defendant's failure to accomplish a proper preplacement evaluation, such flaw does not give rise to damages, or attorney's fees.

5. It should not be forgotten that plaintiffs have achieved only partial victory here: Judge LaBastille's decision has been reversed, but so has Judge Perselay's. As such, at best, they are only partially a prevailing party, and any attorney's fees awarded would so reflect. *See generally Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

opinions, that choice is particularly difficult here, because of the profound effect it will have upon the future of this child. As indicated, the court is satisfied that the parties and the experts have been and are only interested in what is best for Alisa. Forced to choose, the court follows the dictates of law and conscience, and sustains the program of partial mainstreaming now in effect.

In so doing, the court recognizes, as did the underlying legislation, the advantages of a handicapped child's participation in a regular school program. Much can be learned from exposure to one's peers and lost if segregation occurs. Social and psychological development are best attained through mainstreaming and may be substantially curtailed if it is denied in circumstances such as these.

Although disruption to other class members is a proper consideration, it is significant to note that Alisa's classmates have also benefitted and learned from Alisa's presence in the classroom. The record is replete with findings that her classmates are solicitous, helpful, understanding and patient. Therefore, rather than interfering with their education, it appears that her presence has enhanced it. While she has benefitted from her exposure to her peers, they have learned compassion, understanding and patience for one who is different and less fortunate. It is difficult to envision a lesson better worth learning.

The court hopes and believes that Alisa and her classmates will continue to benefit from Alisa's presence in the classroom. The EAHCA dictates that both be given that opportunity. Counsel for plaintiff is directed to submit an order consistent with this Opinion.